William, excuse me, Williams and Filmer v. the National Gallery. From the other side, okay, thank you. Good morning, your honors. David Rowland for the appellants. Your honors, this matter does not involve any drug trafficking or dogfighting, but it does involve an important painting that was stolen in the aftermath of World War II. It involves the portrait of Marg Mole by Henri Matisse, which was stolen from Marg Mole during the upheaval following World War II. The plaintiffs, the grandchildren of Marg Mole, seek the recovery of her portrait from the National Gallery. I am having difficulty just understanding your theory of expropriation. Can you help me? Yes, absolutely. The essential issue here is this, is that the district court ruled the following. It said, with respect to taking of rights and property in violation of- Painting to a colleague of his for safekeeping in Switzerland. The colleague converted it. It went through a series of galleries and ultimately showed up at the Knoedler and then at the National Gallery. I don't understand how the British government expropriated the painting. I don't understand your theory. Well, the theory is that the National Gallery was in lawful possession of the painting until the true owner came and demanded its return. What event constituted the expropriation? The expropriation was the refusal by the National Gallery to return the painting to the true owners. That is the Mole heirs. That's the theory. Refusal to return can constitute, under the expropriation exception, a taking. Absolutely, yes. Have we ever, has anybody ever, other than maybe one district court, anybody ever said that? Yes, that was the holding in the Malevich case. The Malevich case is an extremely similar case to this case. It was also entrusted first to a custodian, to a trustee. Following the entrustment, there was a loan of the painting to the city of Amsterdam. The city of Amsterdam didn't know what to do because they were also offered by the custodian the right to purchase. They didn't purchase for a period of two years. Then they purchased the painting, and then following that, the Malevich heirs tracked down where the paintings were, demanded them back, and then they were refused by the city of Amsterdam. That was the taking in violation of international law, the taking of rights and property in international law. The district court judge in Williamstown, in order for . . . The gallery didn't take anything. They bought it. They took it when they refused to return it to the true owners of it. That's what they did. They took rights and property. The expropriation clause . . . Didn't they already have rights and property? I'm sorry? They already had those rights and the property because they had acquired the painting. They acquired rights in the property, but they didn't have . . . The superior rights in the property were in the plaintiffs. The plaintiffs had title to the painting and they never relinquished title to the painting. It was stolen from them, so that the title that was obtained by the National Gallery when they bought it was the title that they obtained essentially from a thief. A title that you get from a thief is not better than the title that you have as an owner whose artwork is stolen. The superior title in this case is with the plaintiffs. That's why when the plaintiffs demanded the return of the artwork and it was refused, that was the taking of rights and property, the interference of rights and property with the true owners who are the grandchildren and the heirs of Marg Mole. It was her portrait, as we know. There is another part of the language of the expropriation exception, 1605A, and it's taken in violation of international law, which restricts the definition of a taking. I'm going to ask you two questions. First, you referenced Malevich. Did the district court in that case actually describe what the taking was in that case? Did it define what a taking was in that case? No, the district court did not do that, so the only way we know is by looking at the amended complaint. That was more a jurisdictional issue, not a case about how to define taking? Is that right? No, the district court had to reach the conclusion that there had been an expropriation in violation of international law. In order to do that, it had to look at the amended complaint. That's what we have to do to it because it didn't ever say specifically in its decision why it found that there was an expropriation of rights and property in violation of international law. What we have to do is we have to look at the amended complaint to understand what the court was thinking. What principle of international law did the National Gallery violate? It violated the principle of expropriating property without any compensation to the true owner, and that's what we had here. How did it expropriate? Your argument seems to me essentially circular. It bought the painting. It didn't expropriate it. It did. It expropriated because it took a painting which had been stolen from someone that disappeared over many years and then resurfaced, and it purchased a stolen painting. When the true owners came and demanded it back, just as in Malevich, it refused to return it to its true owners, and that's the expropriation. And, of course, they didn't give any compensation. It might be a conversion, but I don't see how it's an expropriation. I mean, it seems to me you're just kind of trying to tack a label onto a series of events to which it doesn't apply. Help me understand what I'm missing. Well, again, it's the refusal to return. For example, we also have the Shabab case. Refusal to return is not expropriation. I would beg— If that is your—if that's the linchpin of your theory, I've got to tell you I'm having some difficulty with it. But I would beg to differ. I think that that's exactly the point, is that when you have someone who has superior rights, who has superior title in property, for example, in a valuable artwork, and someone—under New York law, when someone purchases that property from someone who's not the true owner, from a thief, for example, and when the true owner comes and demands the return of the property and the holder of the property refuses to return it, that is, in effect, that changes their ownership, that changes their—the way they hold it from being a lawful holding of the property to being an unlawful holding of the property. It's conversion. Well, but it's also a taking. Exactly what the judge said is that a taking has to be a physical taking, and we disagree. A taking does not have to be a physical taking. Well, it does have to be by state, by sovereign. Exactly. It has to be by a sovereign, and that's what we have here. I have a concern, but maybe you can square this concern. The concern is that you are rendering every sovereign liable under the expropriation exception for just any request by any party for return of property. So as soon as the sovereign says no, the expropriation exception kicks in even though the sovereign did not itself originally convert the property. How do we cabin that? How do you propose that we cabin that? Because if you're right, then I can go and find some sovereign that—some state entity that happens to hold some property that thousands of years ago didn't belong to it. The British Museum has probably got a lot of artifacts like this, and I could ask for a return. And what you are telling us is that under 1605, that is an exception to sovereign immunity. So help me square those different various concerns. Help me allay those concerns. Well, first of all, we have to ask ourselves the question, why is there sovereign immunity in the first place? So there is something called the restrictive theory, and our Foreign Sovereign Immunities Act is based on the restrictive theory. The restrictive theory says that with respect to the public acts of the sovereign, that you have immunity with respect to those. But with respect to the private acts of the sovereign, you don't have immunity. Where they're acting in a commercial manner, there is no immunity. Where do you cap it in this situation? It has to do with the activities of a sovereign and or the instrumentality of a sovereign, for example, a museum, with respect to property. So it doesn't have to do with everything. It has to do with their commercial activities, and it has to do with their specific activities with regard to— Am I not right? But maybe I've misunderstood your argument that it wouldn't be that hard to manufacture a taking simply by asking for a return of property and being refused. But it's not really manufacturing if you have that right. I mean what we have here in the Moll case is we have superior rights in property. We have superior title because it was stolen. Marg Moll never conveyed title to anybody. She has those rights. Look, I'm very sympathetic to the story, but it's a statute here, a very important statute— Of course. —that we're being asked to interpret, and my concern is that the way that you're asking us to interpret it will yield really unintended results, certainly results that Congress did not intend, and will enable virtually anybody to manufacture a taking in violation of international law if we adopt your interpretation. And the fact that we've also held that the taking has got to be committed by a state is out the window. But we are alleging the taking by the state. As I said, what they're doing is they're in lawful possession, and they haven't done any taking until someone with superior rights in that property, someone from whom it was stolen and has superior rights in that property, comes and demands it to be returned. Could you sue in the United Kingdom? We couldn't sue in the United Kingdom because in 1979, when the painting resurfaced, the statute of limitations in the United Kingdom with respect to the artwork had already expired in 1953. So from the very beginning, there was no right to recover. And the Museums Act, the 1954 Act, and the 1992 Act also bar the deaccession of the painting. The only possibility to recover the painting at all in the U.K. was when the U.K. passed an act in 2009 creating the Spoliation Advisory Panel, which had the right to review artworks lost due to the circumstances of World War II, and then recommend to the government to return those artworks to the true owner. And unfortunately, in this matter, we did that, but the Spoliation Advisory Panel took a very narrow view as to its jurisdiction and said, well, we can hear it up to losses in 1945, but not 1946 or 1947. We thought we had very good arguments to expand it because things were also stolen right in the aftermath of wars in World War II in 46 and 47. And there was also a Lefebvre provenance of the artwork, which said that the Moles only had it until 1945. But the only possibility to return it was under the Spoliation Advisory Panel. Let me just turn very briefly to the American Friends because I have a little trouble understanding that with the acquiescence of the presider. Your theory as to why the American Friends is an appropriately joined defendant is what? It's an alter ego of the National Gallery? Exactly. It's an alter ego. Well, essentially what happened is that the National Gallery came to the United States. It applied for tax-exempt status, and it obtained it. And then it formed the American Friends, which was the Delaware Corporation, which does business right here. And it raises money for the National Gallery? Yes. It's raised approximately $100 million in donations for the National Gallery. And all that money is tax-exempt money raised here in the United States that goes to the National Gallery. And what did they do to harm your client? They didn't do anything to harm our client, but they are based here. What's your claim against them? Our claim against them is that they're an alter ego of the National Gallery, that they're controlled by them. They have the same director. They have the same director. They have, I think, three board members on the board of directors. Where's the allegation that the American Friends organization was used to engage in this taking?  Don't you need that for an alter ego claim? I don't think so in the circumstance where you've got— Don't you need that in every alter ego claim? I think the answer is yes. You may be correct, Your Honor. So there's no allegation that the American Friends was used. But I'm just trying to understand the position. Okay. That's fair. But you have to understand that they have the same director. They have the same board of directors. I understand that there's— It goes also to the commercial activity, which is right here in the Southern District. But you elected to pursue an alter ego theory, and that's what I'm trying to understand. I hope that there's a British Friends of the Smithsonian that does the same thing, but that's another issue. Well, you can talk to them. They're attorneys here. Thank you. Thank you very much, Mr. Wood. I'd just like to make one final point, if I may. I mean, we've read the papers. You're arguing unopposed, and I think we've got the picture. All right. Thank you very much. Thank you.